UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WP COMPANY LLC d/b/a THE WASHINGTON POST**, *et al.*, | |
| **Plaintiffs,** | |
| v. | Civil Action No. 20-1240 (JEB) |
| **U.S. SMALL BUSINESS ADMINISTRATION,** | |
| **Defendant.** | |
| **CENTER FOR PUBLIC INTEGRITY,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 20-1614 (JEB) |
| **U.S. SMALL BUSINESS ADMINISTRATION,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

While the COVID-19 pandemic has upended daily life for all, its effects have proven particularly acute for the nation's small businesses, many of which found their continued operations suddenly threatened in the early weeks of a pandemic-induced recession.  Attempting to keep those businesses afloat and provide other forms of much-needed economic assistance, the federal government on March 27, 2020, passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  A critical component of that law was the Paycheck Protection Program, which enabled the Small Business Administration to approve millions of loans on an expedited basis for qualifying individuals and small businesses.  The next several months witnessed SBA

process an unprecedented $717 billion in loans via the PPP and the separate Economic Injury Disaster Loans (EIDL) program.

Notwithstanding this colossal outlay of taxpayer funds, the government initially refrained from disclosing the identities of the millions of loan recipients under these programs, as well as the specific amounts they obtained and other loan-level details.  Unhappy with this lack of transparency, a host of national-news organizations submitted Freedom of Information Act requests for such data, eventually filing the present action last May when their efforts proved fruitless.  Prompted by this Court, SBA in July finally released select information regarding individual PPP and EIDL loans.  Much to Plaintiffs' continued disappointment, however, the data contained glaring gaps: the agency did not provide both dollar figures and borrower names and addresses for any of the PPP loans, but rather withheld the precise amounts of all loans of $150,000 or more, as well as recipients' identities for loans under that figure.  SBA likewise reserved the names and addresses of sole proprietorships and independent contractors receiving EIDL loans.  In support of its withholding of these data, the agency invoked FOIA's exemptions for confidential and private information.

The parties now cross-move for summary judgment as to the propriety of SBA's withholdings.  In addition, the parties in a largely identical case brought by the Center for Public Integrity move for judgment on the same issues.  Finding that neither of the agency's claimed FOIA exemptions covers the requested information, the Court will grant Plaintiffs' Cross-Motions in both actions and require SBA to supplement its prior disclosure with the names, addresses, and precise loan amounts of all PPP and EIDL borrowers.

I.      **Background**

A.  Factual Background

On January 31, 2020, the federal government declared a public-health emergency

regarding the novel coronavirus, which causes the disease COVID-19.  See U.S. Dep't of Heath

& Hum. Servs., Secretary Azar Declares Public Health Emergency for United States for 2019

Novel Coronavirus (Jan. 31, 2020), https://bit.ly/3mP3551.  The ensuing months saw the virus

take its toll on nearly all walks of American life.  To date, COVID-19 is believed to have killed

over 233,000 people in the United States.  See Johns Hopkins Univ. & Med., Coronavirus

Resource Center, https://bit.ly/31Y81fB (last visited Nov. 5, 2020).  The economy has likewise

suffered, with unemployment reaching a high of 14.7% in April 2020 before steadily declining to

7.9% as of September.  See U.S. Bureau of Labor Statistics, Labor Force Statistics from the

Current Population Survey, https://bit.ly/2Gd8eUB (last visited Oct. 28, 2020).

The CARES Act remains the federal government's primary legislative response to the

economic crisis that the pandemic precipitated.  See Pub. L. No. 116-136, 134 Stat. 281 (2020).

As relevant here, that stimulus package created the PPP, which provided SBA funding and

authority to operate — with support from the Treasury Department — a new loan program to

assist small businesses adversely affected by the COVID-19 crisis.  See id. § 1102; U.S. Dep't of

Treasury, The CARES Act Provides Assistance to Small Businesses, https://bit.ly/3ecUxlm (last

visited Oct. 28, 2020).  Specifically, the CARES Act amended Section 7(a) of the Small

Business Act, 15 U.S.C. § 631 et seq., under which SBA possesses general authority to issue

loans to qualifying small businesses and sole proprietorships, including by guaranteeing loans

made by private lenders.  See 15 U.S.C. § 636(a); 13 C.F.R. § 120.2(a).  The PPP temporarily

expanded the types of entities to which SBA could make covered loans to include non-profit

organizations, independent contractors, and self-employed individuals, and it permitted SBA to guarantee all such loans.  See 15 U.S.C. § 636(a)(36)(D); No. 20-1240, ECF No. 14 (Def. MSJ), Exh. 1 (Declaration of William Manger), ¶¶ 7, 9.

In order to obtain PPP loans, potential borrowers applied to lending institutions and made good-faith self-certifications both that they were eligible and that current economic "uncertainty" rendered the loan request necessary "to support the [recipient's] ongoing operations."  15 U.S.C. § 636(a)(36)(G)(i); Business Loan Program Temporary Changes, Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,814 (Apr. 15, 2020).  Applicants also affirmed that loan funds would "be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments."  15 U.S.C. § 636(a)(36)(G)(i)(II).  SBA has indicated that loans will be fully forgiven if they are in fact used for such costs and if at least 60 percent of the proceeds go toward payroll expenditures.  See Business Loan Program Temporary Changes; Paycheck Protection Program — Revisions to First Interim Final Rule, 85 Fed. Reg. 36,308, 36,311 (June 16, 2020).

Potential borrowers specified the amount of their loan request on the PPP application form.  See SBA, Paycheck Protection Program: Borrower Application Form, https://bit.ly/3jF7tkR at 1 (PPP Application Form).  SBA regulations established a four-step process by which businesses calculated the maximum dollar figure they could borrow, up to $10 million:

> Step 1: "Aggregate payroll costs . . . from the last twelve months," including "compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of

employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation."

Step 2: "Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year."

Step 3: "[D]ivide the amount from Step 2 by 12."

Step 4: "Multiply the [amount] from Step 3 by 2.5."

85 Fed. Reg. at 20,812–13; see also 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb), (II)(aa), (E).  The PPP application further advised that certain information would be "automatically released" upon a FOIA request, including "names of the borrowers" and "the amount of the loan."  PPP Application Form at 4.

SBA also administers the Economic Injury Disaster Loans program, which offers long-term financial assistance to eligible entities — including small businesses, sole proprietorships, and independent contractors — affected by covered disasters such as COVID-19.  See 15 U.S.C. § 636(b)(2); Manger Decl., ¶ 11; SBA, Economic Injury Disaster Loans, https://bit.ly/2TAl3eS (last visited Oct. 28, 2020).  While EIDL borrowers may also obtain a PPP loan, they must use the proceeds from each for different purposes.  See Manger Decl., ¶ 12.  The Court has already described the PPP purposes; conversely, borrowers may deploy EIDL loans to working capital, notes payable, accounts payable, and other expenses resulting from COVID-19's impact.  Id.

By August 8, 2020, SBA had approved a whopping $525 billion by way of more than 5.2 million individual loans.  See SBA, Paycheck Protection Program (PPP) Report at 2, https://bit.ly/2HPJCla (8/8/20 PPP Report).  The agency's most recent EIDL figures similarly

reflect an additional $192 billion in approved COVID-related loans.  See SBA, Disaster

Assistance Update: Nationwide EIDL Loans at 2 (Oct. 19, 2020), https://bit.ly/31Z6oON

(10/19/20 EIDL Report).  It is worth noting that this combined figure of $717 billion exceeds the

government's Medicaid expenditures in Fiscal Year 2018, as well as the President's request for

the Department of Defense's entire Fiscal Year 2021 budget.  See Ctrs. For Medicare &

Medicaid Servs., NHE Fact Sheet, https://go.cms.gov/35JBOd8 (last modified Mar. 24, 2020);

Office of the Under Secretary of Def. (Comptroller), Defense Budget Overview at PDF p. 10

(May 13, 2020), https://bit.ly/31Zuzwz.

     B.  Procedural History

     Throughout April and May 2020, Plaintiffs in Case No. 20-1240 — eleven national-news

organizations — submitted FOIA requests seeking records concerning SBA's COVID-related

loan programs, including the PPP and EIDL program.  See No. 20-1240, ECF No. 5 (Am.

Compl.), Exhs. 1, 2, 5, 9, 12, 13, 14, 18, 20, 24, 27, 29, 31, 33, 35.  Although their requests

contained variations, the organizations generally sought data regarding each approved PPP and

EIDL loan, including the names and addresses of loan recipients, loan amounts, approval dates,

lender identity, and other details.  See, e.g., Am. Compl., Exh. 1 (Washington Post FOIA

Request) at 1–2; id., Exh. 2 (Bloomberg FOIA Request) at 1.

     SBA either declined to timely respond to these requests or issued letters stating that,

sometime "[i]n the future," it would "turn [its] efforts to providing loan specific data to the

public."  E.g., Am. Compl., Exh. 3 (SBA Bloomberg Resp.) at ECF p. 2.  Finding those results

unsatisfactory, the news organizations brought suit in this Court on May 12, 2020.  See No. 20-

1240, ECF No. 1 (Compl.).  Their Amended Complaint, which seeks an order requiring SBA to

make available the aforementioned loan-level data, asserts claims for constructive denial of

requests for agency records and of administrative appeal, as well as actual and constructive denial of expedited processing, all in violation of FOIA.  See Am. Compl., ¶¶ 146–205.

On June 29, 2020, this Court ordered SBA to issue a final response to the news-organization Plaintiffs' FOIA requests and to produce any responsive non-exempt records.  See No. 20-1240, 6/29/20 Min. Order.  One week later, SBA released loan-level data for each of the roughly 4.9 million PPP loans made to that point.  See No. 20-1240, ECF No. 14 (Def. SMF), ¶ 2.  SBA's production included the following fields: the borrower's city, state, ZIP code, North American Industry Classification System (NAICS) code, business type, race/ethnicity, gender, veteran status, non-profit status, jobs reported as retained, date approved, lender, and congressional district.  Id. (citing Manger Decl., ¶ 88 & n.1).  Much to Plaintiffs' displeasure, however, the data did not provide both the loan amount and the recipient's name and address for a single loan.  Instead, SBA adopted an "either/or" approach: for loans of $150,000 or more, it released the recipient's name and address, but withheld the actual loan amount and instead provided "loan amount ranges" of $150,000 to $350,000; $350,000 to $1 million; $1 million to $2 million; $2 million to $5 million; and $5 million to $10 million.  Id.  For loans of less than $150,000, on the other hand, the agency released the precise dollar amounts, but withheld the borrower's name and street address.  Id.  On July 13, 2020, it informed the news-organization Plaintiffs that select "[p]ortions of the [PPP] data are being withheld pursuant to FOIA Exemptions 4 and 6."  E.g., No. 20-1240, ECF No. 13-1 (7/13/20 SBA Letter to Wash. Post) at ECF p. 2; Manger Decl., ¶ 90.  Those exemptions, respectively, protect confidential commercial information and information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.  See 5 U.S.C. § 552(b)(4), (6).

The agency soon settled on a similar partial-disclosure approach as to Plaintiffs' requests for EIDL data. On July 20, 2020, it announced the release of data for all EIDL loans, save the names and street addresses of sole proprietorships and independent contractors, which it withheld pursuant to Exemption 6. See Manger Decl., ¶¶ 91, 112.

Emphasizing the significant public interest in full transparency surrounding the massive disbursement of taxpayer funds pursuant to SBA's COVID-relating lending programs, the news-organization Plaintiffs informed the agency of their intent to challenge the asserted withholdings. See No. 20-1240, ECF No. 13 (7/17/20 Joint Status Report) at 3–4; see also id., ECF No. 18-1 (Pl. Cross-Mot. & Opp.) at 5–8, 25–28 (discussing allegations of ineffectiveness, inequitable treatment, fraud, and abuse regarding PPP and EIDL program); infra at 31–37. SBA countered with a Motion for Summary Judgment, contending that FOIA Exemptions 4 and 6 protect the withheld information from disclosure. The news-organization Plaintiffs opposed that Motion and filed their own Cross-Motion, arguing that FOIA does not permit the agency to withhold any of the PPP or EIDL loan data.

On a parallel track, Plaintiff in Case No. 20-1614 — Center for Public Integrity — filed a separate action in this Court seeking the same information as the news-organization Plaintiffs, as well as some additional material not relevant here. See ECF No. 1 (CPI Compl.), ¶ 10; id., Exh. 1 (CPI FOIA Request); ECF No. 15 (9/11/20 Joint Status Report) (status of request for communications involving SBA Administrator). CPI and SBA also exchanged Summary-Judgment Motions. See No. 20-1614, ECF Nos. 11 (Def. Mot. for Partial Summ. J.), 13 (CPI Cross-Mot. & Opp.). Finding that the briefing in both cases presents identical factual and legal issues, and having received no objection from any party to considering all Motions collectively,

see No. 20-1240, 10/8/20 Min. Order; No. 20-1614, 10/8/20 Min. Order, the Court now consolidates the Motions for disposition.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)

(citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith."

SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  "Unlike the review of other

agency action that must be upheld if supported by substantial evidence and not arbitrary or

capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs

the district courts to 'determine the matter de novo.'"  Dep't of Justice v. Reporters Comm. for

Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III.   Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency

action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976)

(citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the

functioning of a democratic society, needed to check against corruption and to hold the

governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146,

152 (1989) (citation omitted).

The statute provides that "each agency, upon any request for records which (i) reasonably

describes such records and (ii) is made in accordance with published rules . . . shall make the

records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Nine categories of

information are exempt from FOIA's broad rules of disclosure.  See id. § 552(b)(1)–(9).  Where

the agency withholds records, it bears the burden of showing that at least one of the exemptions

applies.  See Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975).  In addition, the

exemptions are to be "narrowly construed," Rose, 425 U.S. at 361, and the reviewing court must

bear in mind "[a]t all times . . . that FOIA mandates a 'strong presumption in favor of

disclosure.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting

U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).  This Court can compel the release of any

records that do not satisfy the requirements of at least one exemption.  See Reporters Comm.,
489 U.S. at 755.

Here, SBA relied on Exemptions 4 and 6 in support of its decision to withhold particular
segments of the requested loan data.  As Plaintiffs dispute the applicability of both of these
exemptions, the Court will address arguments as to each in turn.

A.  Exemption 4

SBA invoked Exemption 4 to withhold the precise amounts of all PPP loans of $150,000
or more, as well as the names and addresses of all borrowers of PPP loans of less than that
figure.  See Def. SMF, ¶ 3; Manger Decl., ¶¶ 100–02.  The Court begins with the legal
framework governing the exemption before applying it to the circumstances of this case.

1.  *Legal Framework*

Exemption 4 shields from disclosure "commercial or financial information obtained from
a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  To demonstrate that this
exemption shelters the information withheld, SBA must show that it is "(1) commercial or
financial, (2) obtained from a person, and (3) privileged or confidential."  Pub. Citizen Health
Res. Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

This case turns on the third prong, which the Supreme Court recently clarified in Food
Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019).  That opinion began by
discussing two potential conditions for information communicated to another to be deemed
"confidential": 1) the information is "customarily kept private, or at least closely held, by the
person imparting it"; and 2) the party receiving the information "provides some assurance that it
will remain secret."  Id. at 2363.  While the first condition "has to be" met in order for
information to be considered confidential under Exemption 4, the Court found "no need to

resolve" whether the second was likewise mandatory — that is, whether privately held information can "lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." Id.  The Court concluded, accordingly, that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  Id. at 2366 (emphasis added).

    After Food Marketing, therefore, it is an open question in this Circuit whether government assurance that information will remain private is necessary for such information to qualify as "confidential" under Exemption 4.  See Ctr. for Investigative Reporting v. U.S. Customs & Border Protection, 436 F. Supp. 3d 90, 112 (D.D.C. 2019) (remarking that Food Marketing "stopped short . . . of deciding that Exemption 4 does in fact impose this second requirement").  Regardless of whether such additional condition is required in every case, it is clear that the government must show that the commercial or financial information is "both customarily and actually treated as private" in order to withhold it.  Food Mktg., 139 S. Ct. at 2366; see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Commerce, No. 18-3022, 2020 WL 4732095, at *3 (D.D.C. Aug. 14, 2020).

    2.   *Application*

    With that prelude in tow, the Court finds it helpful to briefly survey what is not in dispute here.  No party contends that the withheld information is not "commercial or financial," as required by the first prong.  See 5 U.S.C. § 552(b)(4); see also Pub. Citizen, 704 F.2d at 1290.  Neither do the news-organization Plaintiffs gainsay that it was "obtained from a person," thereby satisfying Exemption 4's second condition.  See 5 U.S.C. § 552(b)(4).  To be sure, CPI briefly

argues otherwise, asserting that "the amount of each loan" is not "obtained from a person."  CPI Cross-Mot. & Opp. at 4–5.  The Court, however, need not resolve that issue.  As will soon become evident, even assuming that SBA is correct on this point, it <u>still</u> may not withhold the loan data under the third prong, as disclosure would not reveal any information "that has 'customarily' and 'actually' been treated as private."  Pl. Cross-Mot. & Opp. at 14.  And because SBA flunks this requirement, the Court need not tackle the question left open after <u>Food Marketing</u> — namely, whether the government must also establish that it provided assurance that the information will remain private.  <u>See id.</u> at 14 (arguing that Court need not reach this question); No. 20-1240, ECF No. 20 (Def. Reply & Opp.) at 1, 8 (same).

Turning now to that critical portion of the third prong, the Court begins by clarifying the parameters of the parties' disagreement.  SBA does not argue that the requested loan data, or anything contained therein, is *per se* confidential business information.  Rather, it contends that the loan data must be withheld because its release would necessarily reveal entirely different information that <u>is</u> confidential — specifically, a borrowing company's average payroll.  That is, according to SBA, a business customarily and actually treats its payroll information as confidential.  <u>See</u> Def. MSJ at 13–14; Def. Reply & Opp. at 6.  And because of the nature of the formula by which PPP loan amounts are determined, "average payroll can be deduced with reasonable confidence from the precise value of a PPP loan," thus requiring SBA to withhold either a borrower's identity or precise loan amount.  <u>See</u> Def. MSJ at 8, 12, 14–15; <u>see also id.</u> at 14–15 (citing <u>Flightsafety Servs. Corp. v. Dep't of Labor</u>, 326 F.3d 607, 612 (5th Cir. 2003), which recognized need to protect against "serious risk that sensitive business information could be attributed to a particular submitting business"); Manger Decl., ¶ 100 ("Because Exemption 4 protects a business's payroll information, which can be deduced from the business's PPP loan

amount with reasonable confidence, Exemption 4 also protects (a) the identity of the borrower of any PPP loan, where the precise amount of the loan is disclosed, and (b) the precise amount of any PPP loan, where the borrower's identity is disclosed.").

Although SBA spills much ink arguing that a business's payroll is "confidential" under Exemption 4, see Def. MSJ at 12–15; Def. Reply & Opp. at 4–6, the news-organization Plaintiffs largely concede the point.  See No. 20-1240, ECF No. 21 (Pl. Reply) at 5 n.2 ("Plaintiffs do not contest that an individual for-profit business's payroll information can be confidential under Exemption 4 . . . .").  Instead, they take aim at the core assumption underlying SBA's argument, without which the agency's entire theory collapses — to wit, the idea that the requested loan data necessarily reveals a business's payroll information.  In the absence of a direct link between a borrower's PPP loan and its payroll, of course, the loan data cannot be withheld pursuant to Exemption 4, as it would not reveal any information that is "customarily and actually treated as private."  Food Mktg., 139 S. Ct. at 2366.  SBA, notably, never makes any suggestion to the contrary.

In order to assess the validity of SBA's central assumption, the Court must return to the agency's formula for dispensing PPP loans.  Attentive readers will recall that the maximum loan a qualifying borrower could obtain was a figure 2.5 times its average monthly payroll, where such payroll excludes compensation paid to employees in excess of $100,000 annually.  See 85 Fed. Reg. at 20,812–13.  In arguing that releasing a borrower's precise loan amount "effectively would disclose its payroll information," Def. MSJ at 12, therefore, SBA expressly "assumes" two factual predicates: 1) "that a [PPP] borrower took out a loan for the maximum amount allowed"; and 2) "that a PPP borrower would pay few if any of its employees more than $100,000."  Def. Reply & Opp. at 7.  If a borrower took out a maximum loan and pays no

employees six figures or more, the agency maintains, a third party could calculate the borrower's average monthly payroll simply by dividing its loan amount by 2.5.  Neither of SBA's two premises, however, is necessarily true for any given borrower.  Indeed, after largely skirting the issue in its opening brief, the agency now admits that entities receiving PPP loans defied both assumptions.  See id., Exh. 1 (Def. Resp. to Pl. SMF), ¶¶ 18–19.  A closer look only reinforces the fundamentally flawed nature of SBA's assumptions, thereby rendering the agency unable to establish — as is its burden — that onlookers could deduce a business's payroll from the loan data with any degree of confidence sufficient to justify nondisclosure.

First, although SBA "assumes that a borrower took out a loan for the maximum amount allowed," Def. Reply & Opp. at 7 (emphasis added), it admits that this is plainly not always the case.  See Def. Resp. to Pl. SMF, ¶ 18 (conceding that, in fact, "PPP borrowers did not all receive the maximum loan amount available to them").  It is far from obvious — and SBA nowhere demonstrates — that even a significant majority of PPP applicants sought and obtained the maximum possible loan amount.

Some borrowers, for instance, might have pursued less than the maximum loan figure because they had doubts about their ability to make the financial decisions necessary to ensure loan forgiveness in a turbulent pandemic economy.  Shortly after lenders began accepting PPP loan applications, SBA made clear that it would fully forgive loans only if funds were spent on designated budget items such as payroll, mortgage interest, rent, and utilities.  See 85 Fed. Reg. at 20,813–14 (explaining that forgiveness turns on whether "borrower uses all of the loan proceeds for forgiveable [sic] purposes[,] . . . and employee and compensation levels are maintained," and mandating that "not more than 25 percent of the loan forgiveness amount may be attributable to non-payroll costs").  The agency later reiterated those general requirements,

clarified that a borrower must devote at least 60 percent of its PPP loan to payroll costs to receive full loan forgiveness, and warned that forgiveness will be reduced if full-time headcount declines, or if salaries and wages decrease.  <u>See</u> 85 Fed. Reg. at 36,310–11; Business Loan Program Temporary Changes; Paycheck Protection Program — Requirements — Loan Forgiveness, 85 Fed. Reg. 33,004, 33,007–08 (June 1, 2020); <u>see also</u> 15 U.S.C. § 9005(b), (d). In other words, businesses knew during the application period that if they borrowed too much and either could not meet spending thresholds or were forced to curtail staffing or salaries, they risked losing out on loan forgiveness.  SBA declines to address this issue at all, much less counter Plaintiffs' argument that the potential loss of loan forgiveness likely provided businesses a disincentive to automatically borrow the maximum dollar figure available.  <u>See</u> Pl. Cross-Mot. & Opp. at 16; Pl. Reply at 5–6.

Instead, SBA points to the context in which borrowers applied for loans, asserting that "serious economic distress" arising from the pandemic provided businesses "an obvious reason to borrow as much as the PPP made available to them."  Def. Reply & Opp. at 7; <u>see also</u> <u>id.</u>, Exh. 2 (Second Declaration of William Manger), ¶¶ 6–7.  As just described, however, many businesses likely had an equally "obvious" reason <u>not</u> to borrow the maximum amount available. The potential loss of loan forgiveness likewise answers SBA's argument that the fact that borrowers could receive only a single PPP loan encouraged them to maximize the amount of such loan while they could.  <u>See</u> Def. Reply & Opp. at 7 (citing Manger 2d Decl., ¶ 10); 15 U.S.C. § 636(a)(36)(G)(i)(IV) (requiring "during" specified period "that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan"); 85 Fed. Reg. at 20,814 (similar).  Finally, SBA highlights the PPP loan-application form itself, which contained a field for "Average Monthly

Payroll" and stated that such amount "x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request."  Manger 2d Decl., ¶ 9.  According to the agency, the application form thus "steered borrowers to the maximum loan amount for which they were eligible," essentially "invit[ing] [them] to request the maximum loan amount."  Id.  But SBA does not refute that borrowers could request less than the amount to which they were "steered."  Nor does it indicate, or provide even a rough sense of, how many borrowers either sought or ultimately obtained such lesser loan figures — even as it admits that some in fact did.  See Def. Resp. to Pl. SMF, ¶ 18.

In addition, although SBA "assum[es] . . . that a PPP borrower would pay few if any of its employees more than $100,000," Def. Reply & Opp. at 7 (emphasis added), the agency once again admits that such assumption is often unfounded.  See Def. Resp. to Pl. SMF, ¶ 19 (conceding that "[b]usinesses that pay salaries of greater than $100,000 received PPP loans").  As mentioned earlier, compensation paid to employees in excess of $100,000 annually is excluded from payroll calculations under the PPP.  The fact that loan recipients concededly defy SBA's assumption thus further undermines its asserted link between the loan data and payroll information.  For instance, the agency does not resist Plaintiffs' assertion that PPP recipients included "at least 45 . . . of the nation's 200 highest-grossing law firms," many of which pay even their most junior associates over $100,000.  See Pl. Cross-Mot. & Opp. at 17.  (Indeed, as the Court is painfully aware, many mid-level associates earn more than federal judges.)  SBA has done nothing to assure the Court that there are not many more such borrowers, even though it bears the burden of justifying nondisclosure under Exemption 4.  See Pub. Citizen Health Res. Grp. v. FDA, 185 F.3d 898, 904 (D.C. Cir. 1999).

This is relevant because if a borrower pays an employee over $100,000, thereby excluding compensation above that threshold from payroll calculations, an onlooker could not

accurately determine payroll from the amount of the loan.  This means that without knowing

which borrowers had employees in that category, along with their precise salaries, no third party

could confidently assess the payroll of any borrower.  Indeed, SBA never even establishes the

proportion of PPP borrowers that do not pay any employees more than $100,000, such that the

Court could conceivably conclude that the agency's assumption, while imperfect, nonetheless

justifies withholding the loan data.

The closest SBA comes to this latter point is its declarant's relating an apparent

Department of Treasury estimate "[b]ased on available W-2 data" that "77% of all small

businesses do not have any employees whose salary exceeds $100,000."  Manger 2d Decl., ¶ 11.

As an initial matter, the declaration provides no citation for that proposition, nor any support for

its contention that "[n]ationwide, many businesses are unlikely to pay any salaries in excess of

$100,000."  Manger Decl., ¶ 98.  More critically, neither does SBA offer any basis for its

apparent assumption that the population of "all small businesses" — however the uncited

Treasury estimate defines such term — is representative of the entities that were eligible for,

sought, and received PPP loans.  One might reasonably presume, for instance, that borrowers

with existing ties to banks had easier access to a finite stock of PPP loans, and that these

borrowers are more likely to pay higher salaries.  Regardless of the merit of such proposition, the

point is that SBA must do more to buttress its unsupported assertion that the "vast majority of

PPP borrowers have no employees who earn more than $100,000 per year."  Def. Reply & Opp.

at 8.  At present, such claim lacks any evidentiary or statistical backing as it relates to the pool of

borrowers itself.

In sum, far from creating a "clear mathematical relationship" between PPP loan amount

and average monthly payroll, see Def. MSJ at 15, the CARES Act and its implementing

regulations enable only bare speculation as to any connection between the two figures for a given

borrower.  Without knowledge of whether a borrower sought and received the maximum

possible loan and pays any employees more than $100,000 annually (and, if so, how many and

by how much), third parties are in the dark about payroll.  Cf. McDonnell Douglas Corp. v. U.S.

Dep't of Air Force, 375 F.3d 1182, 1191–92 (D.C. Cir. 2004) (affirming release of data where

there was neither viable theory nor evidence supporting claim that release would enable third

party to calculate information protected by Exemption 4); Acumenics Res. & Tech. v. U.S. Dep't

of Justice, 843 F.2d 800, 807–08 (4th Cir. 1988) (holding that disclosure of withheld unit-price

information would not reveal confidential "profit multiplier" because asserted "assumptions"

underlying third party's ability to derive multiplier from unit-price information were

"unsupported" and turned on "unascertainable variables").

The situation may well be different had SBA offered evidence that nearly all PPP

borrowers obtained the maximum amount and paid no employees more than $100,000, such that

disclosure of their identities along with loan figures would reveal a borrower's payroll

information in all but the rarest of instances.  The present case, however, is far afield from that

hypothetical state of affairs.  FOIA, as a reminder, mandates a "strong presumption in favor of

disclosure."  Nat'l Ass'n of Home Builders, 309 F.3d at 32 (quoting Ray, 502 U.S. at 173).  The

government "bears the burden of proving the applicability of any statutory exemption it asserts in

denying a FOIA request," Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000),

and it must furnish "detailed and specific information" to justify its withholding.  Campbell v.

Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998).  SBA has not met that obligation here.  As a

result, even assuming that a business's payroll qualifies as "confidential" under Exemption 4, the

agency may not withhold borrowers' names, addresses, and loan amounts pursuant to such

provision, as disclosure would not reveal any commercial information that is "customarily and actually treated as private." Food Mktg., 139 S. Ct. at 2366.

As a final coda, even were SBA correct that releasing the loan data would enable calculation of salary and wage information for many borrowers, the agency likely still could not withhold such information under Exemption 4. This is so because the PPP loan application expressly notified potential borrowers — admittedly in a form disclaimer — that their names and loan amounts would be "automatically released" upon a FOIA request. See PPP Application Form at 4; infra at 23–27 (elaborating on PPP application disclaimer in context of Exemption 6). The Court need not resolve the open question in Food Marketing — whether the government must assure borrowers that the loan data would remain private in order for it to fall within the scope of Exemption 4 — to recognize, as courts in this district already have, that "whether the agency provided an 'assurance of privacy' is undoubtedly relevant to determining whether commercial information possessed by [the agency] is 'confidential.'" Shapiro v. Dep't of Justice, No. 12-313, 2020 WL 3615511, at *26 (D.D.C. July 2, 2020) (emphasis added) (quoting Food Mktg., 139 S. Ct. at 2363); see also Stotter v. U.S. Agency for Int'l Dev., No. 14-2156, 2020 WL 5878033, at *5 (D.D.C. Oct. 3, 2020) (similar). Here, SBA does not explain how the loan data could remain "confidential" for purposes of Exemption 4 when the Government not only provided no assurance of privacy, but also told borrowers explicitly that the information would be disclosed.

B.  Exemption 6

As SBA need only invoke one valid exemption to successfully withhold records, it alternatively believes that Exemption 6 is its lucky ticket. That exemption covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted

20

invasion of personal privacy." 5 U.S.C. § 552(b)(6).  SBA relied on this exemption to withhold

the names and addresses of borrowers of PPP loans of less than $150,000, as well as names and

addresses of sole proprietorships and independent contractors that received EIDL loans of any

amount.  See Def. SMF, ¶¶ 3–4; Manger Decl., ¶¶ 102, 110, 112.  This exemption would

therefore overlap in part with the agency's Exemption 4 withholding.

Plaintiffs do not dispute that the information at issue qualifies as "personnel and medical

files and similar files," and that Exemption 6 is "therefore relevant."  Nat'l Ass'n of Retired Fed.

Emps. v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989); see also Judicial Watch, Inc. v. FDA, 449

F.3d 141, 152 (D.C. Cir. 2006) (explaining that Exemption 6 covers "not just files, but also bits

of personal information, such as names and addresses, the release of which would 'create[] a

palpable threat to privacy'") (alteration in original) (quoting Carter v. U.S. Dep't of Commerce,

830 F.2d 388, 391 (D.C. Cir. 1987)).  Indeed, the D.C. Circuit has held that "Exemption 6

applies to financial information in business records when the business is individually owned or

closely held, and the 'records would necessarily reveal at least a portion of the owner's personal

finances.'"  Multi Ag Media LLC v. Dep't of Agriculture, 515 F.3d 1224, 1228–29 (D.C. Cir.

2008) (quoting Nat'l Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 685 (D.C. Cir.

1976)).  As SBA explains — and as the news-organization Plaintiffs do not contest — a

"significant portion" of businesses receiving loans under $150,000 are individually owned or

closely held, such that disclosing their identities would reveal a component of their owners'

personal finances — e.g., the simple fact of a loan itself.  See Def. MSJ at 22–24 (quoting Multi

Ag Media, 515 F.3d at 1229, and citing Manger Decl., ¶ 111).

The parties' disagreement focuses instead on whether disclosure of the identities of

borrowers of PPP loans of less than $150,000 and EIDL loans of any amount "would constitute a

clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  That inquiry, in turn, involves a "balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information." U.S. Dep't of Def. Dep't of Mil. Affs. v. FLRA, 964 F.2d 26, 29 (D.C. Cir. 1992) (quoting Rose, 425 U.S. at 372); see also Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (requiring courts to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information") (quoting Davis v. Dep't of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

The Court, accordingly, begins with the private interest in withholding borrower names and addresses, then turns to the public interest in disclosure, and concludes with a balancing of the two.  Because the scales tip decidedly in favor of disclosure, the Court holds that SBA's invocation of Exemption 6 is no more successful than its assertion of Exemption 4.

1. *Private Interest*

The threshold question for Exemption 6 is "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." Multi Ag Media, 515 F.3d at 1229 (cleaned up).  "A substantial privacy interest is anything greater than a *de minimis* privacy interest." Id. at 1229–30.  Even if a privacy interest is deemed substantial, however, the Circuit has implied that some interests may be less compelling than others. Id. (characterizing privacy interest as not "particularly strong," but nevertheless "greater than *de minimis*").  In any event, "[f]inding a substantial privacy interest does not conclude the inquiry; it only moves it along to the point where [the Court] can address the question whether the public interest in disclosure

22

outweighs the individual privacy concerns." Id. at 1230 (citation and internal quotation marks omitted).

Some PPP and EIDL borrowers are individuals, while others are businesses. See Manger Decl., ¶¶ 9, 113; Def. MSJ at 19. As to the former, SBA contends that "individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information," Lepelletier v. FDIC, 164 F.3d 37, 47 (D.C. Cir. 1999), and that the loans various individuals received plainly qualify as such. See Def. MSJ at 19–22. As to the latter, since some are sole proprietorships and closely held corporations, the agency argues that the individual owners of such entities likewise "have substantial privacy interests in the fact that their businesses received EIDL or PPP loans." Id. at 22. SBA finds support for this position in D.C. Circuit caselaw, which recognizes that although "businesses themselves do not have protected privacy interests under Exemption 6," disclosing records that "reveal financial information easily traceable to an individual . . . jeopardizes a personal privacy interest that Exemption 6 protects." Multi Ag Media, 515 F.3d at 1228; see also Consumers' Checkbook v. U.S. Dep't of Health & Hum. Servs., 554 F.3d 1046, 1051 (D.C. Cir. 2009) ("We have . . . recognized substantial privacy interests in business-related financial information for individually owned or closely held businesses because the 'financial makeup of the businesses mirrors the financial situation of the individual family members.'") (quoting Multi Ag Media, 515 F.3d at 1229).

Plaintiffs do not dispute that, as a general matter, individual owners of sole proprietorships and closely held businesses have reasonable privacy interests in financial information readily traceable to them. Instead, they argue that in the "particular circumstances" of this case, any privacy interest in the loan data is "minimal at most" because SBA "expressly told borrowers that their names and loan amounts would be public" when they applied for loans.

<u>See</u> Pl. Reply at 10–11, 13; Pl. Cross-Mot. & Opp. at 20.  For the following reasons, the Court

agrees that — at the very least — SBA's own loan materials substantially diminish the privacy

interest at stake here.

All individuals and businesses seeking PPP and EIDL loans completed application forms.

The PPP application contained a series of notices, including a FOIA-related disclaimer that read,

in relevant part:

> Subject to certain exceptions, SBA must supply information
> reflected in agency files and records to a person requesting it.
> Information about approved loans that will be <u>automatically</u>
> <u>released</u> includes, among other things, statistics on our loan
> programs (individual borrowers are not identified in the statistics)
> and other information such as the <u>names of the borrowers</u> (and their
> officers, directors, stockholders or partners), the collateral pledged
> to secure the loan, the <u>amount of the loan</u>, its purpose in general
> terms and the maturity.  Proprietary data on a borrower would not
> routinely be made available to third parties.

PPP Application Form at 4 (emphasis added); Manger 2d Decl., ¶ 17.  SBA thus expressly

informed potential PPP borrowers that their "names" and "amount of the loan" received would

be "automatically released" upon a FOIA request.  Similarly, SBA told EIDL applicants that

FOIA "generally" requires it to release "information such as names of borrowers," as well as

"loan amounts at maturity."  SBA, <u>COVID-19 Economic Injury Disaster Loan Application</u> at

PDF p. 12, https://bit.ly/2HKKYOe (EIDL Application Form).  All loan applicants were thus on

notice that their names and approved loan amounts would be public record.

Courts in this district have recognized that privacy interests under Exemption 6 are

diminished when individuals provide information to the government despite notice that the

relevant agency will disclose it to the public.  For instance, one court deemed it "remarkable"

that an agency objected to disclosure of the names and addresses of individual commenters on a

proposed rulemaking, where an agency document "made it abundantly clear . . . that the

individuals submitting comments to its rulemaking would not have their identities concealed."
All. for Wild Rockies v. Dep't of Interior, 53 F. Supp. 2d 32, 37 (D.D.C. 1999).  Another court
determined that an agency could not withhold commenters' email addresses in part because the
comment-submission form warned that "[a]ll information submitted, including names and
addresses, will be publicly available via the web."  Prechtel v. FCC, 330 F. Supp. 3d 320, 329
(D.D.C. 2018) (alteration omitted).  That notice, which "could hardly have been more
straightforward," provided commenters "ample indication that their email addresses could be
made public, mitigating any expectation of privacy."  Id.; see also id. at 330 (explaining that
when someone is "told that her email address will become part of the public record, her privacy
interest in that email address is not as strong as the [agency] now suggests").  The import of
these cases for the present one is evident: where SBA explicitly and unambiguously told loan
applicants that their names and approved loan amounts would not remain private, such
notification substantially "mitigat[es]" any individual privacy interest in the withheld
information.  Id. at 329.

Attempting to resist this straightforward result, SBA advances a series of arguments that
essentially all reduce to the unavailing contention that the agency did not mean what the loan-
application forms actually said.  SBA principally focuses on the PPP form, claiming first that it
"did not purport to override the [agency's] Standard Operating Procedure," which "for many
years has committed SBA to preserving the confidentiality of payroll information."  Def. Reply
& Opp. at 10; see No. 20-1240, ECF No. 15-2 (SBA Attachments), Exh. Q (SBA Standard
Operating Procedure) at 54 (stating that information generally exempt from disclosure includes
business's "payroll information").  But that is of no moment.  The Court has already debunked
SBA's assertion that disclosure of a given borrower's PPP loan necessarily reveals its payroll.

See *supra* at 14–20.  In any event, SBA fails to mention that the <u>very next page</u> of the SOP lists

"[n]ames and commercial street and email addresses of recipients of approved loans" and

"[k]inds and amounts of loans" under the heading, "INFORMATION GENERALLY

DISCLOSED."  SBA SOP at 55; <u>see also</u> SBA, <u>FOIA</u>, https://bit.ly/34JI1GS (last visited Oct.

28, 2020) (SBA FOIA Website) (same).  So even if a potential borrower unsure about the

confidentiality of its information looked past the PPP application and to the SOP — a document

mentioned nowhere on the application itself — that manual would only <u>confirm</u> the application's

notification that names and loan amounts would be disclosed, thereby further diminishing any

privacy interest an individual might reasonably claim.

 SBA next argues that the Court should ignore the plain import of the PPP form's

disclaimer because the document was created in "an extraordinarily short timeframe" and "was

substantially derived" from the preexisting application form for the Section 7(a) business-loan

program, which routinely releases loan-level data including names, addresses, and loan amounts.

<u>See</u> Manger 2d Decl., ¶ 17; <u>see also</u> SBA FOIA Website (providing "SBA 7(a) & 504 loan data

reports" from 1991 to present under "Frequently requested records").  In other words, because

SBA hastily "transplanted" the notice from that preexisting form "in the midst of a global

pandemic," it "cannot bear the weight that Plaintiffs would accord it."  Def. Reply & Opp. at 10,

14.  The Court, to be clear, does not find that the disclaimer itself resolves the Exemption 6 issue

in favor of Plaintiffs.  But any carelessness that the agency now cites cannot alter the fact that it

explicitly told potential borrowers that their identities and loan amounts would be disclosed,

thereby lessening their expectation of privacy.

 Similarly, SBA emphasizes the form's indication that information "automatically

released" includes the "collateral pledged to secure the loan."  <u>Id.</u> at 10; <u>see</u> PPP Application

Form at 4.  Because PPP loans do not require collateral — and because Section 7(a) loans do —
SBA concludes that "the most natural reading" of the notice "is that it applies only to Section
7(a) loans, not PPP loans."  Def. Reply & Opp. at 10; see also Manger 2d Decl., ¶ 18.  This
interpretation, however, demands a tangled traverse between the agency's various programs and
applications: borrowers must recognize that the PPP form's reference to "collateral" is inapt, be
aware of the separate 7(a) program, understand that such program requires collateral, cross-
reference the PPP application with a 7(a) form they need not even complete, and then conclude
that the PPP disclaimer does not in fact apply in the PPP context, notwithstanding its inclusion
on the program form.  See Pl. Reply at 9.  The Court finds that the far more "natural" reading,
see Def. Reply & Opp. at 10, is also the far simpler one: the application's promise of name and
loan-amount disclosure means what it says.

     Finally, SBA fixates on its pronouncement that "[p]roprietary data on a borrower would
not routinely be made available to third parties."  PPP Application Form at 4.  According to the
agency, because the loan data ostensibly reveals "proprietary" payroll information, the
disclaimer "reinforces the conclusion that SBA promised confidentiality."  Def. MSJ at 17.  Yet
even if the loan data necessarily revealed a borrower's payroll — and, as the Court has
explained, it does not — the agency's argument still would go nowhere.  It is well established,
albeit in statutory construction, that when two provisions conflict, "[t]o eliminate the
contradiction, the specific provision [must be] construed as an exception to the general one."
RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012).  Even
assuming, therefore, the existence of a conflict when the agency told potential borrowers
generally that it would safeguard proprietary data, but instructed specifically that it would
"automatically release[]" names and loan amounts, a reasonable reader could hardly expect the

former assurance to somehow override the latter.  SBA's sole reference to the EIDL form —

which, as a reminder, similarly instructs that borrower names and loan amounts will "generally"

be released, see EIDL Application Form at PDF p. 12 — fares no better.  While that application

also noted that SBA does "not routinely make available to third parties . . . information that

would . . . constitute a clearly unwarranted invasion of personal privacy," Def. Reply & Opp. at

14 (citing EIDL Application Form at PDF p. 12), such disclaimer simply reinforces the

unquestioned reality that Exemption 6 applies as a general matter, and it has no bearing on the

distinct, antecedent question of whether the form mitigates any privacy interest a borrower might

reasonably claim.

Looking past its own damaging statements, SBA mounts several further efforts to

heighten the privacy interest at stake.  Specifically, it contends that disclosure of loan-recipient

identities for EIDL and smaller PPP loans would: 1) inform the public that borrowers recently

had "money in the bank," thereby exposing them to targeting or soliciting from competitors or

creditors; 2) reveal the fact that PPP borrowers had certified that loans were "necessary . . . to

support . . . ongoing operations" given "the uncertainty of current economic conditions"; and 3)

expose "with reasonable confidence" the incomes of independent contractors and self-employed

individuals, by way of the PPP loan formula discussed in the Exemption 4 context.  See Def.

MSJ at 20–22; Manger Decl., ¶ 108.

The Court harbors doubts about the force of these concerns.  For instance, SBA does not

explain with much particularity the asserted harm that would obtain were creditors and

competitors to learn of a borrower's PPP loan, which the borrower may not even still have.  In

addition, a generic attestation from the smallest of small businesses in the middle of a pandemic-

triggered economic collapse that money was necessary to support ongoing operations hardly

seems noteworthy.  It is nonetheless unnecessary to explore these issues fully, for the Court has already determined that SBA has nudged the privacy interest at hand past the "*de minimis*" threshold — if only barely, in light of the agency's own loan-application disclaimers.  See Prechtel, 330 F. Supp. 3d at 330 (finding that notwithstanding agency promise of disclosure, individuals retained "some privacy interest in non-disclosure" of personal information); Multi Ag Media, 515 F.3d at 1230 (finding privacy interest not "particularly strong," but nevertheless "greater than *de minimis*").  With a valid, albeit weak, privacy interest established for individual borrowers and individual owners of sole proprietorships and closely held corporations, the Court may now move along to the public interest.

2. *Public Interest*

Before the Court may balance the privacy interest against the public interest in disclosure, "there must be proper public interests to even put on the scales."  Jurewicz v. U.S. Dep't of Agriculture, 891 F. Supp. 2d 147, 156 (D.D.C. 2012).  The "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government."  Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (cleaned up).  Because that basic purpose "'focuses on the citizens' right to be informed about what their government is up to,' information that 'sheds light on an agency's performance of its statutory duties' is in the public interest."  Multi Ag Media, 515 F.3d at 1231 (quoting Reporters Comm., 489 U.S. at 773).

Here, the Court has little doubt that disclosure of the withheld information would serve the public interest.  In light of SBA's awesome statutory responsibility to administer the federal government's effort at keeping the nation's small businesses afloat amidst an economic and

29

health crisis of unprecedented proportions, the public interest in learning how well the agency

fulfilled its charge is particularly pronounced.  As of August 8, SBA had approved a whopping

$525 billion in loans pursuant to the PPP, and it has tacked on an additional $192 billion in

COVID-related EIDL loans through mid-October.  See 8/8/20 PPP Report at 2; 10/19/20 EIDL

Report at 2.  Production of the records sought would reveal the complete list of borrowers that

benefited from this substantial outlay of public funds, as well as the precise loans they obtained.

This information, "valuable in itself to enhance 'public understanding of the operations or

activities of the government,'" also enables meaningful evaluation of whether the PPP and EIDL

program are being operated consistent with applicable legal constraints; whether funds have been

distributed fairly, equitably, and devoid of fraud; and whether the programs are achieving their

purpose.  See Nat'l Public Radio, Inc. v. FEMA, No. 17-91, 2017 WL 5633090, at *8 (D.D.C.

Nov. 21, 2017) (quoting FLRA, 510 U.S. at 495).

 The D.C. Circuit has recognized a "significant" public interest in disclosure in a case

similar to this one, emphasizing that "there is a special need for public scrutiny of agency action

that distributes extensive amounts of public funds in the form of subsidies and other financial

benefits."  Multi Ag Media, 515 F.3d at 1232.  Other courts have likewise affirmed the

"undeniable and powerful" public interest in shedding light on "whether [an agency] has been a

proper steward of billions of taxpayer dollars."  News-Press v. U.S. Dep't of Homeland Sec., 489

F.3d 1173, 1191–96 (11th Cir. 2007) (emphasizing public interest in data surrounding agency's

handling of disaster-relief claims); see also United States v. Suarez, 880 F.2d 626, 630 (2d Cir.

1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent,

particularly when the amount is large."); Wash. Post. Co. v. U.S. Dep't of Agriculture, 943 F.

Supp. 31, 36 (D.D.C. 1996) (explaining that "[a] significant public interest lies in shedding light on" agency's "workings" and "administration of [its] massive subsidy program").

Plaintiffs identify an array of issues surrounding SBA's handling of its CARES Act duties on which disclosure of the withheld information would shed light.  To start, they point to questions surrounding the PPP's effectiveness in achieving its goal of supporting small businesses and encouraging them "to keep their workers on the payroll."  SBA, Paycheck Protection Program, https://bit.ly/2HRRzqz (last visited Oct. 28, 2020).  For instance, Plaintiffs highlight reports that "many small firms didn't receive money in the initial [round of PPP] funding."  Pl. Cross-Mot. & Opp., Exh. 3 (4/22/20 Wall St. J. Article) at ECF p. 3.  Many of those loan requests remained unfulfilled even as public companies and other well-capitalized entities received substantial disbursements, some of which returned their loan proceeds amid public criticism.  Id.; see also id., Exh. 5 (5/8/20 Bloomberg Article) at ECF p. 2 (citing examples of large restaurant operators Shake Shack, Ruth's Hospitality Group, and Potbelly).

Relatedly, Plaintiffs raise questions about alleged inequities in the dispensing of PPP loans.  A May 2020 report from SBA's Office of Inspector General found that the agency had not yet issued congressionally encouraged guidance regarding the prioritization of small businesses in underserved and rural communities, such that "rural, minority and women-owned businesses may not have received the loans as intended."  SBA Inspector General, Flash Report: Small Business Administration's Implementation of the Paycheck Protection Program Requirements at 4 (May 8, 2020), https://bit.ly/34HZVcU; see also 15 U.S.C. § 636(a)(36)(P)(iv); Pl. Cross-Mot. & Opp. at 6–7 (citing news articles questioning whether businesses unable to secure loans were hindered by race or geography).  In both cases, given the "controversy" surrounding the loan-allocation process, disclosure of the identities of loan

recipients would facilitate public evaluation of "whether" and "how" SBA fulfilled its statutory mission to assist small businesses throughout the country.  Prechtel, 330 F. Supp. 3d at 332 (emphasis removed).

Even more critical — and particularly relevant to the substantial public interest at hand — are the well-documented allegations of fraud related to the disbursement and receipt of CARES Act funds.  "[T]he protection of the public fisc is a matter that is of interest to every citizen."  Brock v. Pierce County, 476 U.S. 253, 262 (1986).  Numerous cases, accordingly, have recognized a public interest in determining whether government programs dispensing taxpayer money involve fraud, waste, or abuse.  For instance, in Washington Post, the court ordered the release of data pertaining to a Department of Agriculture subsidy program, emphasizing "allegations of fraud and conflict of interest, supported by government reports and investigations, as well newspaper articles and other information" that were "sufficient to raise nonspeculative questions" about the program's administration.  See 943 F. Supp. at 36.  Similarly, Multi Ag Media noted that releasing the withheld information would enable the public to "more easily determine whether USDA is catching cheaters and lawfully administering its subsidy and benefit programs."  515 F.3d at 1232; see also News-Press, 489 F.3d at 1191–92 (emphasizing "substantial" public interest in learning whether agency fulfilled statutory responsibility to appropriately handle disaster-relief claims amidst allegations of fraud and waste); Nat'l Public Radio, 2017 WL 5633090, at *8 (noting that Office of Inspector General's "repeated identification of [agency's] mismanagement of [grant program] confirms the value of further public scrutiny of" program administration).

Here, Plaintiffs have gone far beyond mere hypothetical concerns surrounding the integrity of CARES Act programs, pointing instead to actual instances in which individuals have

been criminally prosecuted for PPP-related fraud.  As of mid-September 2020, the Department of

Justice had publicly charged more than 50 people with fraudulently obtaining PPP loans.  See

Pandemic Oversight, Charged: PPP Scammers (Sept. 16, 2020), https://bit.ly/31XEoLn

(Pandemic Oversight Release); see also, e.g., Dep't of Justice, Man Indicted for COVID-19

Related Loan Fraud (May 29, 2020), https://bit.ly/2JekQMi (announcing prosecution of

individual for PPP and EIDL fraud).  These prosecutions — which ranged from targeting

individuals who lied about having legitimate businesses to coordinated criminal rings mounting

systemic looting — detailed more than $70 million of actual loss.  See Pandemic Oversight

Release (alleging that individuals used PPP funds to buy "luxury cars, homes, renovations,

jewelry — and even adult entertainment and gambling").  Indeed, SBA's own inspector general

seemingly acknowledged that such fraud was rampant, characterizing the aforementioned

prosecutions as "the smallest, tiniest piece of the tip of the iceberg."  Stacy Cowley, Spotting $62

Million in Alleged P.P.P. Fraud Was the Easy Part, N.Y. Times (Aug. 28, 2020),

https://nyti.ms/34IzHqQ.

    As if that were insufficient to "confirm[] the value of further public scrutiny," Nat'l

Public Radio, 2017 WL 5633090, at *8, several additional features of SBA's lending programs

reinforce concerns surrounding their integrity.  First, the substantial size of the PPP and EIDL

program, along with the rapid speed at which scores of applications were approved, likely

created an ideal environment for fraud.  See Manger Decl., ¶ 13 (stating that in April 2020, SBA

"processed more than 14 years' worth of PPP loans in less than 14 days"); U.S. Gov't

Accountability Off., COVID-19: Opportunities to Improve Federal Response and Recovery

Efforts at PDF p. 3 (June 25, 2020), https://bit.ly/3mwKWbM (6/25/20 GAO Rep.) (noting that

rapid pace of PPP loan processing "raised program integrity concerns"); U.S. Gov't

Accountability Off., <u>COVID-19: Federal Efforts Could Be Strengthened by Timely and Concerted Actions</u> at 324 (Sept. 21, 2020), https://bit.ly/2TEGDii (9/21/20 GAO Rep.) (highlighting similar concerns for EIDL program).  As the Acting Assistant Attorney General put it recently, "[A]ny time the federal government makes a large amount of money available to the public on an expedited basis, the opportunities for fraud are clear."  Dep't of Justice, <u>Acting Assistant Attorney General Brian Rabbitt Delivers Remarks at the PPP Criminal Fraud Enforcement Action Press Conference</u> (Sept. 10, 2020), https://bit.ly/3kKnlUv.  In addition, and similarly born of necessity, both programs relied heavily on borrower self-certifications of eligibility, which "can leave a program vulnerable to exploitation by those who wish to circumvent eligibility requirements or pursue criminal activities."  6/25/20 GAO Rep. at PDF p. 47; <u>see also</u> 9/21/20 GAO Rep. at 324 (reporting that acceptance of EIDL self-certification "increased fraud risk").  This heightened potential for abuse only augments the value of disclosing the full range of PPP and EIDL loan recipients, which will enable the public to take its own look at the programs and "more easily determine whether" the government "is catching cheaters."  <u>Multi Ag Media</u>, 515 F.3d at 1232.

SBA, for its part, largely ignores the above.  It even concedes that "there is a public interest in understanding how public funds are deployed through the PPP and EIDL programs."  Def. Reply & Opp. at 15; <u>see also</u> Manger Decl., ¶ 113 (admitting that "the public has a general interest in knowing who has received public funds through the PPP loan program").  Instead, the agency attempts to minimize that interest, contending that much of it "has been satisfied by the information that is <u>already</u> publicly available" — namely, the identities of PPP borrowers with loans of above $150,000 and various non-identifying details about smaller loans — and that the

value of releasing the additional withheld information is relatively minimal.  See Def. Reply &

Opp. at 15–16; see also Def. MSJ at 25.

The Court is unpersuaded.  No doubt, SBA's prior disclosures have proven useful in

shining a light on programs that previously were entirely opaque.  But many important aspects of

their operation remain veiled.  Disclosure of the identities of recipients of PPP loans of less than

$150,000, as well as the sole proprietors and independent contractors receiving EIDL loans, will

contribute substantially to public understanding of SBA's "performance of its statutory duties."

Nat'l Ass'n of Home Builders, 309 F.3d at 35 (quoting Bibles v. Or. Nat. Desert Ass'n, 519 U.S.

355, 356 (1997)).  The statistics themselves are striking: loans of less than $150,000 make up

over 87% of all PPP loans.  See Pl. Reply at 12 (citing 8/8/20 PPP Report at 6).  In other words,

the public has no official record as to the identities of the vast majority of PPP borrowers, as well

as the many sole proprietorships and independent contractors receiving EIDL loans.  SBA rejoins

that PPP loans of above $150,000 — for which it has released borrower identities, even if not

precise loan amounts — account for "almost 75%" of all PPP funds lent.  See Def. Reply at 16

(citing Manger 2d Decl., ¶ 30).  Yet even on the agency's terms, that leaves over $130 billion in

public funds disbursed to unknown entities as of August 8 — a staggering sum by any measure.

See 8/8/20 PPP Report at 2.  Production of the withheld data would thus reveal a vast array of

previously unknown information concerning a substantial component of a government aid

program of massive proportions.

Indeed, within this expansive pool of public moneys allocated to currently unidentified

beneficiaries, the potential for insight into "what the Government is up to" abounds.  Reporters

Comm., 489 U.S. at 773.  To start, disclosure of loan recipients' identities would further the

"important public interest" of "enabl[ing] identification of fraud against the government."  Nat'l

Public Radio, 2017 WL 5633090, at *11.  SBA's briefing is silent on the topic of fraud and abuse, save its brief reference to the agency's commitment to review all PPP loans greater than $2 million (and others "as appropriate").  See Def. Reply & Opp. at 16 (citing Manger 2d Decl., ¶ 31).  Yet loans over $2 million merely scratch the surface of the agency's PPP activity, making up just 0.6% of all loans.  See 8/8/20 PPP Report at 6.  Even under SBA's promise, therefore, nearly the whole gamut of PPP loans would receive no government scrutiny — and the public would have nowhere to start for over 87% of them (i.e., the loans of less than $150,000) as a direct result of the agency's withholding.

Release of the full range of borrower identities would also "enable the press and the public to monitor whether taxpayer funds have been distributed fairly and equitably."  Pl. Reply at 12.  Although SBA claims it has "already released demographic data for PPP loans," Def. Reply & Opp. at 16, the Government Accountability Office has explained that because loan applications did not request such data, "information was not reported for business owners' race for 90 percent of approved loans, gender for 79 percent of approved loans, and veteran status for 85 percent of approved loans."  9/21/20 GAO Rep. at 99–100.  Especially in light of the popular attention surrounding whether minority-owned businesses were able to promptly and readily obtain PPP loans, see Pl. Cross-Mot. & Opp. at 6–7, 26 n.3 (citing news articles), there is great value in enabling the public to mine the loan data and cross-reference it with other publicly available information to gain a more complete picture of the range of government-approved borrowers.  See Pl. Reply at 12–13; see also Pl. Cross-Mot. & Opp., Exh. 30 (7/9/20 Minneapolis/St. Paul Bus. J. Article) at 2 (noting inability to determine number of minority-owned Minnesota businesses that received PPP loans in part because those "that took out PPP loans of less than $150,000 . . . were not disclosed").

Various reports, furthermore, have documented a substantial number of "gaps, outliers, duplicates, and anomalies in PPP loan-level data."  9/21/20 GAO Rep. at 103; see also Letter from Mary Gay Scanlon, Member, House of Representatives, to Jovita Carranza, Administrator, SBA at 1 (Aug. 12, 2020), https://bit.ly/37YhZBI (referencing "litany of concerning discrepancies" in PPP data, and requesting that SBA investigate approved loan for restaurant that had been closed for seven years).  As one member of Congress explained, "[T]horough oversight of the funds that have already been dispersed" will help ensure that "future funds can be fairly and effectively distributed."  Scanlon Ltr. at 1.  Here, the non-identifying details SBA previously released about smaller PPP loans, as well as EIDL loans to independent contractors or sole proprietors, leave much to be desired.  So long as borrower identities are withheld, the public is effectively precluded from playing a meaningful role in this oversight process.

Contrary to SBA's apparent belief, the fact that the public already knows some information about the agency's CARES Act lending activity does not preclude the existence of a "great public interest" that would be served by releasing more information.  See Def. Reply & Opp. at 16; see also News-Press, 489 F.3d at 1194–96 (rejecting agency argument that previously released disaster-relief disbursement data, broken down by zip code, was sufficient, and explaining that zip codes are not "an altogether accurate or complete way for the public to evaluate [agency's] distribution of aid"); Nat'l Ass'n of Home Builders, 309 F.3d at 36–37 (finding "strong" public interest in disclosure of data that would contribute to public understanding of government's activities, when public previously had only "partial understanding" of those activities).  Without the information withheld pursuant to Exemption 6, "the public would have great difficulty" determining whether SBA has fairly and equitably apportioned a staggering sum of taxpayer money to the smallest of businesses, in a fashion that

minimizes the potential for fraud.  See Multi Ag Media, 515 F.3d at 1231.  That reality reflects a powerful public interest in disclosure.

> 3.  *Balancing*

"Having found both a greater than *de minimis* privacy interest and a significant public interest in disclosure" of the loan data, the Court "must now balance the two to determine whether the agency has met its burden to show that 'the substantial interest in personal privacy is not outweighed by the public interest in disclosure.'"  Id. at 1232 (quoting Sims v. CIA, 642 F.2d 562, 573 (D.C. Cir. 1980)).  In balancing those interests, "unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail," and the agency may not withhold the files under Exemption 6.  Ray, 502 U.S. at 177.  Indeed, "the purpose and plain language of the Act mandate a strong presumption in favor of disclosure," Multi Ag Media, 515 F.3d at 1232 (internal quotation marks and citation omitted), which "is at its zenith under Exemption 6."  Nat'l Ass'n of Home Builders, 309 F.3d at 37; see also Stern v. FBI, 737 F.2d 84, 91 (D.C. Cir. 1984) (noting that Exemption 6 strikes "a balance tilted emphatically in favor of disclosure") (citation omitted).  "That presumption is of special force" where an agency "distributes extensive amounts of public funds" in the administration of benefit programs.  Multi Ag Media, 515 F.3d at 1232.

Here, the Court finds that the balancing is not particularly close.  The significant public interest in shedding light on SBA's administration of the PPP and EIDL program dramatically outweighs any limited private interest in nondisclosure.  See Nat'l Ass'n of Home Builders, 309 F.3d at 36–37 (determining that "strong public interest in knowing 'what the government is up to'" overcame "relatively weak" privacy interest, such that agency "failed to rebut the presumption favoring disclosure"); Prechtel, 330 F. Supp. 3d at 331–32 (concluding that

"minimal" privacy interest paled in comparison to "significant" public interest in disclosure, which could help root out "fraud and abuse" and "clarify the extent to which the [agency] succeeded" in managing allegedly corrupted process); AquAlliance v. U.S. Bureau of Reclamation, 139 F. Supp. 3d 203, 214 (D.D.C. 2015) (finding that public interest in "monitor[ing]" agency's administration of water-transfer programs outweighed "relatively weak privacy interests").

Multi Ag Media once again offers useful instruction.  There, the D.C. Circuit found that disclosure of the withheld information would implicate a "substantial privacy interest," but nonetheless concluded that the "significant public interest in disclosure . . . outweigh[ed]" that privacy interest.  See 515 F.3d at 1226, 1233.  In so holding, the court relied upon: 1) the agency's "rather tepid showing" that release of the withheld information would intrude upon a substantial privacy interest; 2) the "special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits"; 3) the fact that Congress "recognized the importance of ensuring the responsible use of these funds" by creating an Office of Inspector General within the agency to police fraud and abuse; and 4) FOIA's presumption in favor of disclosure.  Id. at 1232–33.

Each of these elements is present here.  First, SBA has made a relatively weak, albeit sufficient, showing that disclosure would implicate borrowers' reasonable privacy interests. Second, production would facilitate public monitoring and scrutiny of a government aid program vast in both size and sweep.  Third, Congress affirmed the importance of ensuring responsible use of CARES Act funding by creating the Pandemic Response Accountability Committee to "promote transparency and conduct and support oversight of covered funds," as well as to "prevent and detect fraud, waste, abuse, and mismanagement."  Pub. L. 166–136, § 15010(b).

Finally, FOIA's presumption in favor of disclosure is fully applicable.  See Nat'l Public Radio, 2017 WL 5633090, at *10 (similarly analogizing to Multi Ag Media).  In these circumstances, the weighty public interest in disclosure easily overcomes the far narrower privacy interest of borrowers who collectively received billions of taxpayer dollars in loans.

In sum, Exemption 6 does not protect the names and addresses of borrowers of PPP loans of less than $150,000, as well as those of sole proprietorships and independent contractors receiving EIDL loans.

## IV.   Conclusion

For the foregoing reasons, the Court will grant the news-organization Plaintiffs' Cross-Motion for Summary Judgment and CPI's Cross-Motion for Partial Summary Judgment and order that Defendant release the names, addresses, and precise loan amounts of all individuals and entities that obtained PPP and EIDL COVID-related loans by November 19, 2020.  A separate Order so stating will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 5, 2020